RENDERED: APRIL 30, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1906-MR

LOUISVILLE/JEFFERSON COUNTY
METRO GOVERNMENT
                                                          APPELLANT


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE ANN BAILEY SMITH, JUDGE
                    ACTION NO. 17-CI-006634


JILL HUME                                                 APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: GOODWINE, MAZE, AND MCNEILL, JUDGES.

MAZE, JUDGE: Louisville/Jefferson County Metro Government (Metro) appeals

from a judgment confirming a jury verdict in favor of Lieutenant Jill Hume (Lt.

Hume). Metro argues that it was entitled to a directed verdict because Lt. Hume

failed to establish the essential elements of her hostile work environment claim.

We conclude that the trial court did not err by submitting Lt. Hume's claims to the

jury. We further conclude that Metro was not unfairly prejudiced by Lt. Hume's closing argument. Hence, we affirm.

Viewing the evidence in the light most favorable to Lt. Hume, as we are compelled to do, the relevant facts of this matter are as follows. After graduating from the Training Academy, Lt. Hume began working for the Louisville Metro Police Department (LMPD). By 2016, she had risen to the rank of Lieutenant and was assigned to work in the Special Operations/Special Events unit in LMPD's First Division. In the course of her duties, Lt. Hume occasionally worked with Lt. Rob Shadle (Lt. Shadle), but their relationship had never been anything other than professional.

Lt. Hume testified that, on February 10, 2016, Lt. Shadle came to her office looking for the unit commander, Major Kelly Jones. The two spoke briefly, and Lt. Shadle left after Lt. Hume told him Major Jones was not there. Later that day, Lt. Hume received a text message from Lt. Shadle on the "WhatsApp" messaging application. The text simply read, "hey you." Lt. Hume ignored the message.

The following day, Lt. Hume received another text from Lt. Shadle, again reading, "hey you." The text was followed by another message reading, "This is Rob the cop." Late in the evening on February 14, Lt. Shadle sent Lt. Hume a photo of a man holding an erect penis and testicles, accompanied by the

text, "thinking about you." She immediately responded to the message with, "Hey jackass you are texting the wrong f***ing person stupid." She also told her husband about the photo and message. Lt. Shadle's name and photo was included with the messages.

The following day, Lt. Hume spoke to several coworkers, who suggested that she report the incident. On February 16, Lt. Hume advised Major Jones about the incident. Major Jones testified that Lt. Hume was reluctant to file a formal complaint. However, Lt. Hume testified that Major Jones minimized the contact and asked if she had ever had a relationship with Lt. Shadle. Lt. Hume also testified that Major Jones actively discouraged her from filing a complaint, repeatedly suggesting that the matter be handled informally, and he pointed out the potentially negative effect that a formal complaint may have for Lt. Shadle's career.

Lt. Hume and Major Jones met again over the next two days. On several occasions, Lt. Hume was presented with a document waiving a formal investigation. She declined to sign the document. After consulting with several other officers, Lt. Hume filed a formal complaint February 19. The resulting investigation was conducted by Lt. Joshua Hasch of the Professional Standards Unit (PSU).

On February 22, Lt. Shadle sent a text message to Lt. Hume, thorough regular messaging, requesting that she call him. Lt. Shadle's message stated that he had heard a rumor floating around him and he would like to talk to her about it. The message concluded by stating he understood if she did not want to talk to him. Lt. Hume reported the message. The following day, Lt. Shadle was given a verbal order to have no contact with Lt. Hume.

In his interviews with investigators, Lt. Shadle stated that he never intended to send the photo or texts to Lt. Hume. Rather he intended to send the text to a person named "Jillian Smith," with whom he had a relationship previously. Smith contacted the investigators and provided a statement over the phone, but she was not called as a witness. Smith confirmed Lt. Shadle's account that they had an online relationship about a year before the incident in question.

On March 24, 2016, Lt. Hasch issued preliminary findings concluding that the charge against Lt. Shadle for conduct unbecoming an officer was sustained. On March 31, Lt. Hasch issued additional findings that Lt. Shadle had not intended to send the photo or texts to Lt. Hume, and there was no evidence he had engaged in a pattern of inappropriate conduct. Accordingly, Lt. Hasch concluded that the charge against Lt. Shadle for sexual harassment was not sustained. On April 11, former Chief Steve Conrad adopted the findings and imposed a twenty-day suspension without pay.

While the investigation was proceeding, Lt. Hume met with then-Chief Steve Conrad and Deputy Chief Michael Sullivan. In these meetings, Lt. Hume repeatedly emphasized that she did not want to see or have any contact with Lt. Shadle. However, Lt. Shadle later had another person contact Lt. Hume's husband via text message and voice mail. In response, Lt. Shadle was given a written no-contact order from his superior. Several other officers reported seeing Lt. Shadle around Lt. Hume's work area, even though he was not assigned to that unit. Lt. Hume also stated that she saw Lt. Shadle at the promotion ceremony for another officer and at "Compstat" meetings (Department Briefings). Lt. Hume also testified that she had seen Lt. Shadle working traffic near the Portland Festival, even though he had been ordered not to work the event. Lt. Hume also alleges that details about her complaint against Lt. Shadle became widely known in the Department.

On December 12, 2017, Lt. Hume filed a complaint against Metro, alleging that she was subjected to sexual harassment and a hostile work environment in violation of the Kentucky Civil Rights Act (KCRA). Following discovery, Metro moved for summary judgment, which the trial court denied. The matter then proceeded to a jury trial in October 2019. The jury returned a verdict in favor of Lt. Hume and awarded damages of $1,200,000, plus attorney fees.

Metro now appeals from this judgment. Additional facts will be set forth below as necessary.

Metro primarily argues that the trial court erred by denying its motion for directed verdict on Lt. Hume's sexual harassment and hostile work environment claims. As an initial matter, Lt. Hume argues that Metro's brief fails to comply with CR[1] 76.12(c)(v). Lt. Hume notes that the brief fails to comply with the rule because it does not include references to the record at the beginning of each argument showing where the issue was properly preserved and in what manner. However, we note that Metro's statement of the case does include a reference to the record indicating that Metro moved for a directed verdict. While this is not strictly in compliance with the rule, the reference at that point in the brief could be sufficient to show that the issue was preserved for review.

We are more concerned that the reference in Metro's brief only states that it made a motion for directed verdict at the close of Lt. Hume's case. It is well-established that a motion for a directed verdict made at the close of the plaintiff's case is not sufficient to preserve error unless renewed at the close of all the evidence. *Kimbrough v. Commonwealth*, 550 S.W.2d 525, 529 (Ky. 1977), *overruled on other grounds by Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020). "A defendant must renew his motion for a directed verdict, thus allowing the trial

---

[1] Kentucky Rules of Civil Procedure.

court the opportunity to pass on the issue in light of all the evidence, in order to be preserved for our review." *Steel Technologies, Inc. v. Congleton*, 234 S.W.3d 920, 926 (Ky. 2007), *abrogated on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012). Where the motion for directed verdict was not renewed at the close of proof, this Court is not authorized to address the alleged error.

We caution that it is not the responsibility of this Court to search the record to determine if issues are properly preserved for review. *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 53 (Ky. 2003). Furthermore, Metro had the opportunity to correct the omission once it was raised in Lt. Hume's brief. But after careful review of the record before us, we note that Metro renewed its motion for directed verdict at the close of proof. Video Record 10/03/2019; 4:36:58-4:37:09. Under the circumstances, we conclude that Metro adequately preserved the denial of its motion for directed verdict.

When a directed verdict is appealed, the standard of review on appeal consists of two prongs. The prongs are: "[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 215 (Ky. App. 2009) (quoting *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998)). "A motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the

-7-

motion is made." *Id.* (quoting *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988)).

Metro argues that Lt. Hume failed to present sufficient evidence to establish actionable claims against it for sexual harassment and a hostile work environment. A sexual harassment claim brought under the KCRA, KRS[2] 344.010 *et seq.*, "is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Ammerman v. Bd. of Educ. of Nicholas Cty.*, 30 S.W.3d 793, 797-98 (Ky. 2000)). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), the United States Supreme Court held that a sexual harassment claim can be brought based upon a hostile or abusive work environment. For sexual harassment to be actionable under the *Meritor* standard, it must be sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive working environment. *Id.* at 67, 106 S. Ct. at 2405. In other words, hostile environment discrimination exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citation omitted).

---

[2] Kentucky Revised Statutes.

As further explained in *Harris v. Forklift Systems*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993),

> As we pointed out in *Meritor*, "mere utterance of an . . . epithet which engenders offensive feelings in a employee," *ibid.* (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at 21-22, 114 S. Ct. at 370.

Rather, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S. Ct. at 371.

Based on this standard, a plaintiff seeking to establish a *prima facie* case of a hostile work environment based on sex must show that:

> (1) she is a member of a protected class,
> (2) she was subjected to unwelcome sexual harassment,
> (3) the harassment was based on her sex,
> (4) the harassment created a hostile work environment, and that

(5) the employer is vicariously liable.

*Clark*, 400 F.3d at 347 (citations omitted).

Metro concedes that Lt. Hume is a member of a protected class—female.  But Metro first argues that Lt. Hume failed to establish that she was subjected to unwelcome sexual harassment within the meaning of the statute.  Metro concedes that the photo sent by Lt. Shadle was offensive and unwelcome, but contends that a single act cannot constitute harassment as a matter of law.  Metro further argues that Lt. Shadle's other actions, the follow-up text asking to speak with Lt. Hume, the attempted contact with her husband, and his presence at Department events, were not motivated by any animus toward Lt. Hume's gender.

We disagree.  "[T]o be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) (citing *Harris*, 510 U.S. at 21-22, 114 S. Ct. at 370-71).  The photo sent by Lt. Shadle was clearly unwelcome and offensive.  "Non-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, he would not have been the object of harassment."  *Bowman v.*

*Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)).

In this case, a jury could reasonably find that Lt. Shadle's subsequent nonsexual conduct was motivated by Lt. Hume's reporting of the initial harassment. Indeed, Lt. Hume testified that she seldom had any interactions with Lt. Shadle until he sent the photo. Following that contact and her filing of a complaint, Lt. Shadle attempted to contact her and her husband, and he began showing up around her work area and other Department events he had not previously attended. We conclude that his conduct, when taken as a whole, could constitute harassment within the meaning of the KCRA.

The more significant issue is whether Lt. Hume presented sufficient evidence that Lt. Shadle's harassment was sufficiently severe and pervasive to be actionable under the KCRA. *Harris* sets out three criteria for a hostile work environment claim: (1) Sexually discriminatory intimidation, ridicule, and insults, which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment and (4) create an abusive working environment. *Harris*, 510 U.S. at 20-21, 114 S. Ct. at 370. In determining whether a working environment is "hostile" or "abusive," the test is an objective one, not a standard of offense to a "reasonable woman." *Id*. *Harris* added,

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an

environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

*Id.* at 21, 114 S. Ct. at 370.

Metro argues that a single offensive act will rarely be sufficiently severe or pervasive to create a hostile work environment, at least absent physical contact or assault. An isolated incident of harassment, if "extremely serious," is sufficient to create a hostile work environment. *Hickman v. Laskodi*, 45 F. App'x 451, 454 (6th Cir. 2002). In *Hickman*, the coworker threatened to cause bodily harm to his female supervisor. The Sixth Circuit held that this single incident may be sufficiently serious to alter the terms and conditions of employment. *Id.* at 455-56. *See also Ault v. Oberlin College*, 620 F. App'x. 395 (6th Cir. 2015). But in other cases, the Sixth Circuit has held that a single incident of offensive physical contact, followed by occasional offensive comments, were not sufficiently severe or pervasive to constitute a hostile work environment. *See Bowman*, 220 F.3d at 464; *Burnett v. Tyco Corp.*, 203 F.3d 980, 983-84 (6th Cir. 2000).

However, in Kentucky, whether the evidence presented proves misconduct "severe or pervasive" is not a question of law but a question of fact. *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky. 1992).

> In reviewing this issue of evidential sufficiency the appellate court must respect the opinion of the trial judge who heard the evidence. It is significantly more difficult to overrule such a finding, sustained by the trial judge, than it would be to point out that some simple fact, an

> element of proof which need not be evaluated, is missing from the proof. We are not in the same position, or as good a position, as was the judge who sat through this trial to decide whether the jury could reasonably find "severe or pervasive" sexual harassment from the evidence presented.

*Id.* at 821-22.

As noted, the offensive behavior in this case consisted of Lt. Shadle's four texts to Lt. Hume, with the fourth text including the obscene photo. Metro minimizes this behavior, arguing that it could not amount to severe harassment because Lt. Shadle testified that he did not intend to send the text and photo to Lt. Hume. But the jury could have chosen to reject this interpretation, since Lt. Shadle sent the texts very shortly after his initial contact with Lt. Hume. Likewise, the jury could reasonably infer that Lt. Shadle's subsequent attempts to contact her, and to his continued presence around her work area, at Compstat meetings, the promotion ceremony, and the Portland Festival, were more than merely coincidental.

While this is a close question, we are not in a position to disturb the trial court's conclusion that the evidence was sufficient to create a jury issue on whether the conduct was sufficiently severe and pervasive to be actionable under the KCRA. When Lt. Shadle's actions are considered in their entirety, the jury could reasonably conclude that his behavior was objectively and subjectively offensive and created a pervasively hostile working environment to Lt. Hume.

Under the circumstances, we conclude that the trial court did not clearly err in denying Metro's motion for a directed verdict on this issue.

The most significant question is whether Lt. Hume failed to prove a basis for employer liability. Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment yet failed to take prompt and appropriate corrective action. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008). "[W]hen an employer responds to charges of coworker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999) (quoting *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872-73 (6th Cir. 1997), *overruled on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), and *Faragher*, 524 U.S. at 799-800, 118 S. Ct. at 2289).[3]

---

[3] *Ellerth* and *Faragher* held that an employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270; *Faragher*, 524 U.S. 807-08, 118 S. Ct. at 2293. These holdings effectively overruled contrary language in *Blankenship*. *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 684 n.3 (6th Cir. 2005). However, *Ellerth* and *Faragher* did not overrule the discussion in *Blankenship* relating to employer liability for harassment by a non-supervisory coworker. *Fenton*, 174 F.3d at 829-30.

Metro argues that its response to Lt. Hume's complaints was adequate if it was "reasonably calculated to end the harassment." *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749 (6th Cir. 2008) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 663-64 (6th Cir. 1999); *Hawkins*, 517 F.3d at 340). Metro notes that the PSU immediately began an investigation as soon as the complaint was filed. Lt. Shadle was issued a verbal no-contact order and then a written no-contact order after Lt. Hume complained about his continued efforts to contact her and the reports of him being in her work area. The PSU sustained the charge against Lt. Shadle for conduct unbecoming an officer and Chief Conrad imposed a twenty-day suspension without pay.

Based upon these actions, Metro asserts that it promptly responded to Lt. Hume's complaint about the texts and Lt. Shadle's subsequent efforts to contact her. While Lt. Hume may not have been entirely satisfied with the results of the investigation and the punishment imposed, Metro argues that its actions were reasonably calculated to end the harassment. Following the imposition of Lt. Shadle's suspension, his only contact with Lt. Hume took place in the course of their duties as police officers. There was no other offensive conduct. Consequently, Metro maintains that its investigation of Lt. Shadle's conduct and the punishment imposed cannot amount to indifference or was unreasonable.

We note, however, that Metro did not request an instruction to determine whether its investigation and punishment were reasonably calculated to end the harassment. Rather, Metro agreed to the following instruction:

> If you have answered YES to all of the questions posed above, then you shall state whether you are further satisfied from the evidence that Louisville Metro Police Department exercised that degree of care expected of a reasonably diligent employer acting under similar circumstances to promptly correct its employee's behavior toward plaintiff Jill Hume (if you are not so satisfied, answered NO)[.]

The jury unanimously found that LMPD did not exercise the degree of care necessary to promptly correct Lt. Shadle's behavior toward Lt. Hume. In support of this conclusion, Lt. Hume points to the actions of Major Jones and other supervisors, who tried to dissuade her from filing a formal complaint. She also notes that Major Jones pointedly suggested that she may have invited the attention from Lt. Shadle and asked if they were in a relationship. Lt. Hume also contends that the PSU disregarded inconsistencies in Lt. Shadle's explanation that he did not intend to send the obscene photo. She also notes that the PSU failed to obtain a sworn statement from Jillian Smith to confirm that she was the intended recipient of the photo. And Lt. Hume argues that the LMPD disregarded her concerns about having to see Lt. Shadle around her work area. In light of this conduct, Lt. Hume argues that the jury could find Metro's response to her complaints was unreasonable.

-16-

We agree. Although LMPD conducted a prompt investigation and imposed punishment on Lt. Shadle, it consistently minimized the extent of his misconduct. Indeed, LMPD still contends that his actions did not amount to sexual harassment. And even though LMPD issued three orders directing Lt. Shadle to have no contact with Lt. Hume, it failed to take meaningful steps when he violated those orders. To the contrary, Metro takes the position that the no-contact orders did not require Lt. Shadle to avoid any contact with Lt. Hume.

Moreover, LMPD has repeatedly sought to cast Lt. Hume at fault for overreacting to Lt. Shadle's behavior. Finally, Lt. Hume presented considerable evidence of the personal and professional impact on her from Lt. Shadle's misconduct and the LMPD's response to it. We conclude that a jury could reasonably find that Metro's response to her complaints manifested indifference or unreasonableness in light of the facts known to it. Consequently, we conclude that the trial court did not err by denying Metro's motion for directed verdict.

Lastly, Metro argues that it was unfairly prejudiced by the closing argument of Lt. Hume's counsel. Prior to trial, Metro filed a motion *in limine* to preclude Lt. Hume's counsel from arguing that the jury verdict should "send a message to the community" that the conduct by Lt. Shadle and the LMPD was unacceptable. The trial court granted the motion. Near the end of his closing argument, Lt. Hume's counsel addressed the jury as follows:

> I'm asking you to use your discretion and award an amount of money that will adequately compensate her for the injuries she's endured since this happened. And also let the Louisville Metro Police Department know this conduct is not acceptable. That they have to protect employees who have been a victim of his kind of conduct.

At this point, Metro objected, arguing that counsel had violated the trial court's order. The trial court overruled the objection, concluding that counsel had merely asked the jury to send a message to Metro, not to the community. Lt. Hume's counsel then concluded his closing argument.

> I'm going ask you in your verdict to send a message to the Louisville Police Department about their conduct toward Lieutenant Hume.

As a general rule, it is improper to argue that the jury should "send a message to the community" through its verdict. That argument is highly disfavored because it cajoles a jury to base its decision on something other than the evidence. *McMahan v. Commonwealth*, 242 S.W.3d 348 (Ky. App. 2007). However, it is not necessarily improper to argue that the jury should send a message to deter a particular defendant from future misconduct. *See Cantrell v. Commonwealth*, 288 S.W.3d 291, 299 (Ky. 2009); *Fields v. Commonwealth*, 219 S.W.3d 742, 751 (Ky. 2007). The argument by Lt. Hume's counsel falls more into the latter category.

Furthermore, a reviewing Court must determine "whether the probability of real prejudice is sufficient to warrant a reversal. In making this determination, each case must be judged on its unique facts. An isolated instance of improper argument, for example, is seldom deemed prejudicial." *Rockwell Intern. Corp. v. Wilhite*, 143 S.W.3d 604, 631 (Ky. App. 2003) (citations omitted). In the context of the entire argument, we cannot find that Metro was unfairly prejudiced because the message was limited to a small portion at the end of counsel's closing argument.

Accordingly, we affirm the judgment of the Jefferson Circuit Court.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Michael J. O'Connell
Jefferson County Attorney

Peter F. Ervin
Assistant County Attorney
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

Peter F. Ervin
Louisville, Kentucky

BRIEF FOR APPELLEE:

Thomas E. Clay
Kirsten R. Daniel
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLEE:

Thomas E. Clay
Louisville, Kentucky