# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: DECEMBER 14, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0411-MR

CHASE ALLEN SIMMONS                                   APPELLANT

V.              ON APPEAL FROM DAVIESS CIRCUIT COURT
HONORABLE JAMES A. WETHINGTON, JUDGE
NO. 19-CR-01377

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A jury of the Daviess Circuit Court found Appellant Chase Simmons guilty of two counts of murder and one count of assault in the second degree. The jury recommended consecutive sentences of thirty years on each of the murder convictions, together with a concurrent sentence of five years on the second-degree assault conviction, for a total sentence of sixty years. The trial court sentenced Simmons in accordance with that recommendation. Simmons now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). Following a careful review, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 31, 2019, high school sophomore Bailey Eubanks threw an end-of-the-school-year party in a barn at her mother's home in Whitesville.

Eubanks and her friends spread news of the party via social media, resulting in as many as one hundred people attending.

On the same evening, Appellant Chase Simmons, then seventeen years old, and his friend Andrew Pierce smoked marijuana together in Owensboro. Around 11:30 p.m., Pierce and Simmons left in Pierce's car to head to the party. Simmons, who was wearing a black zip-up hoodie and black pants, called his friend Savannah Helm and told her he had learned Jasper "Rex" Brown was at the party. Helm testified there was bad blood between Simmons and Brown because Simmons believed Brown had robbed one of his friends.

When Pierce and Simmons arrived at the party around midnight, Simmons asked Pierce to wait in the car. A few minutes later, numerous gunshots rang out. One witness testified the shooter was a white male dressed in black. Another testified the shooter was wearing a black hoodie and had white hands, while a third witness told police the shooter was Black.[1] Three teenage boys—Brown, Amarius "Mari" Winstead, and Tyler Glover—were shot. Brown and Winstead died soon after, while Glover had surgery and survived without long-term injuries.

Simmons returned to Pierce's car soon after the shootings and told him to "go, go, go!" While Pierce did not recall seeing Simmons with a gun on the way to the party, he testified he saw Simmons holding a Glock on the ride back to Owensboro.

---

[1] Simmons is Caucasian.

While returning to Owensboro, Simmons called Helm via FaceTime and told her he had killed Brown. Helm's friends could hear the conversation because the call was played over the car's speakers. One of those friends thought Simmons sounded "messed up" during the call. Another recalled Simmons texting Helm that evening, saying he was on acid. Helm testified she observed during the call that Simmons was wearing a black zip-up hoodie.

Simmons told Pierce he did not want to go back home and ultimately directed Pierce to the St. Anthony trailer park where April Rednour lived. Pierce testified that when they arrived at Rednour's residence Simmons put a Glock in a baggie on the counter, though Rednour did not see Simmons with any type of weapon.

Rednour did recall that Simmons was "tripping acid" and that he said something about shooting someone. Rednour described Simmons as hyper, energized, intense, and "bouncing off the walls." She explained that he and Pierce were talking to one another, and that the energy was that of two teenage boys interacting. Rednour eventually directed Simmons, Pierce, and Simmons's brother Andrew, who had arrived in the meantime with a rifle, to leave. A few days later Simmons returned to Rednour's residence to pick up a backpack he'd left behind. Rednour gave Simmons the keys to her shed where the backpack was but did not go with him to retrieve it.

On June 6, 2019, police arrested Simmons and seized a backpack which contained, among other items, a cellphone. Analysis of the cellphone confirmed Helm's testimony regarding Simmons's calls to her and placed

3

Simmons at both the party and Rednour's residence. The phone also included photos of Simmons with a handgun with a clear clip and other firearms.

On June 7, 2019, police went to the trailer park where Rednour lives after receiving an anonymous tip. There, under a shed close to Rednour's trailer but not belonging to her, they located a baggie containing a Glock with a clear clip. Ballistics analysis later linked the Glock with shell casings found at the scene of the shootings and identified it as the gun used in those crimes. However no fingerprints were found on the gun or baggie, and Simmons could not be included as a contributor to the partial DNA profiles of three people found on the weapon.

A grand jury indicted Simmons on two counts of murder and one count of second-degree assault. At trial, the Commonwealth introduced over Simmons's objection four of the photos found on his cellphone. Two of the photos showed Simmons posing for the camera with a handgun with a clear clip, along with other weapons. In one of the photos the gun was in Simmons's pocket, and in the other he held the gun in his hand. The remaining two photos showed only firearms, including a handgun with a clear clip. The trial court excluded other photographs from trial, including a photograph of Simmons with a marijuana-leaf themed blanket.

Simmons also requested a voluntary intoxication instruction, which the trial court declined to give. The jury ultimately convicted Simmons of two counts of murder and one count of second-degree assault. The trial court imposed the sixty-year sentence recommended by the jury.

4

**ANALYSIS**

Simmons raises three issues for our review: (1) whether the cellphone photographs of him with firearms were properly authenticated; (2) whether those photos were admissible under KRE[2] 404(b); and (3) whether the trial court erred in denying his request for a voluntary intoxication instruction. We review each issue in turn, providing additional facts as necessary.

### I. The Cellphone Photographs Of Simmons With Firearms Were Properly Authenticated.

Simmons first argues that the trial court erred in admitting the firearms photos retrieved from his cellphone because those photos were not properly authenticated. More particularly, Simmons contends the photos were not authenticated because the Commonwealth could not say when the photos were taken, whether they were taken with the phone or downloaded from another source, or if they contained metadata. Simmons preserved this argument by raising these objections during an in-chambers hearing regarding the photos. KRE 103(a)(1). We therefore consider whether the trial court's admission of the photographs was an abuse of discretion. *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004). That is, we ask "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

KRE 901 requires evidence to be authenticated by proof "sufficient to support a finding that the matter in question is what its proponent claims."

---

[2] Kentucky Rule of Evidence.

KRE 901(a). The Rule sets forth some forms such proof may take, including testimony of a witness with knowledge "that a matter is what it is claimed to be," "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated," and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." KRE 901(b)(1), (3), & (4). To satisfy KRE 901, "a party seeking to introduce an item of tangible evidence need not satisfy an 'absolute' identification requirement, and evidence is admissible if the offering party's evidence reasonably identifies the item." *Grundy v. Commonwealth*, 25 S.W.3d 76, 80 (Ky. 2000).

We find no abuse of discretion in the trial court's admission of the photographs as properly authenticated. At trial the Commonwealth presented proof that police discovered a Glock with a clear clip beneath a shed near Rednour's property. The Commonwealth further presented ballistics proof linking that same clear-clip Glock with shell casings found at the scene of the shootings and identifying it as the murder weapon. The Commonwealth thus sought to introduce the photographs from Simmons's cellphone of him with a clear-clip firearm to establish that the murder weapon was his.

The proof at trial was sufficient to authenticate the photographs for that purpose, *i.e.*, to support a finding that the photographs were in fact what the Commonwealth claimed—images of Simmons with the gun used in the shootings. First, Simmons's mother was a person with knowledge who testified that he was in the photos. This was sufficient to support a finding that the

6

person in the photos was Simmons. KRE 901(b)(1). Second, the jury was shown photographs of the Glock with a clear clip found beneath the shed and confirmed by ballistics analysis to be the murder weapon. As finder of fact, the jury could compare that weapon with the gun in the cellphone photographs to determine whether they were the same firearm. KRE 901(b)(3). In addition, the clear clip shared by both the murder weapon and the gun in the cellphone photographs was sufficiently distinctive to support a finding that the gun in the photograph was the murder weapon. KRE 901(b)(4). The proof at trial was thus sufficient to support a finding that the evidence was what the Commonwealth claimed, *i.e.*, photos of Simmons with the murder weapon.

Finally, we disagree with Simmons's contention that proper authentication required the Commonwealth to prove when the photos were taken, how they ended up on his phone, or whether metadata existed. None of those showings were required to establish what the Commonwealth sought to prove, *i.e.*, that Simmons was in possession of the murder weapon before or at the time of the killings. Simmons's cellphone was seized by law enforcement shortly after the shootings, and thus it was clear the photographs were taken before or near in time to the crimes. Any further detail regarding when the photographs were taken was not necessary to establish what the Commonwealth sought to show, *i.e.*, that Simmons had been in possession of the murder weapon. Nor was it necessary to show how the photographs came to be on Simmons's phone, or that metadata existed for the photographs, to

7

make that showing. As such, we find no abuse of discretion in the trial court's determination that the photographs were properly authenticated.

## II. The Cellphone Photographs Were Admissible Under KRE 404(b).

Simmons also argues admission of the cellphone photographs violated KRE 404(b). Simmons's particular arguments are that the photos were not relevant because it could not be determined when they were taken, whether they were taken by him, or if they included the actual weapon used in the crimes. Simmons also contends the photos were also not relevant insofar as they included additional weapons besides the single Glock used in the crimes. Simmons further asserts the photos were not probative and were substantially prejudicial. Simmons objected both before and during trial to admission of the photographs under KRE 404(b), and thus his objection is preserved. KRE 103(d).

KRE 404(b) governs the admissibility of evidence of other crimes, wrongs, or acts. It provides that such evidence is "not admissible to prove the character of a person in order to show action in conformity therewith." However, the Rule also provides two circumstances in which evidence of other crimes, wrongs, or acts may be admissible. First, such evidence may be admissible if "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). Second, such evidence may also be admissible if it is "so inextricably intertwined with other evidence essential to

8

the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2).

In determining whether to admit evidence of other crimes, wrongs, or acts under KRE 404(b), a trial court must consider the three factors of relevance, probativeness, and prejudice set forth in *Bell v. Commonwealth*, 875 S.W.2d 882 (Ky. 1994). That is, the trial court must consider 1) whether the proffered evidence is relevant for some purpose other than to prove the defendant's criminal disposition, 2) whether evidence of the other crime, wrong, or act is sufficiently probative of its commission by the defendant, and 3) whether the potential prejudice from admission of the proffered evidence substantially outweighs its probative value. *Bell*, 875 S.W.2d at 889-91. In considering these factors, the trial court "must apply [KRE 404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Id.* at 889. We review a trial court's decision to admit evidence under KRE 404(b) for abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007).

Here, we conclude the trial court did not abuse its discretion in finding the cellphone photographs admissible under KRE 404(b). First, as to the *Bell* factor of relevance, the photographs were relevant to establishing Simmons's identity as the shooter and his opportunity to commit the crimes. Simmons's theory of the case was that the shootings were not perpetrated by him but rather by someone else. This theory thus placed the identity of the shooter at issue in the trial. The photographs depicted Simmons with a firearm similar to

9

that identified by ballistics as the murder weapon. Moreover, both the murder weapon and the gun in the photographs had a distinctive clear clip. As such, the photographs were relevant to establish both Simmons's identity as the shooter and his opportunity to commit the shootings. *See Thurman v. Commonwealth*, 975 S.W.2d 888, 898 (Ky. 1998) (holding that evidence defendant was in possession of firearm similar to murder weapon "was relevant evidence.").

The relevance of the photographs was not undermined by the absence of proof of when they were taken, particularly given that the cellphone was seized near the time of the murders. Nor was the relevance of the evidence dependent on how the photographs came to be on Simmons's phone or where related metadata was. Finally, it was not necessary for the Commonwealth to establish with certainty that the firearm in the photographs was the same weapon used in the murders. The murder weapon and the firearm in the photographs were sufficiently similar that a reasonable jury could conclude they were the same gun. That determination was for the jury, and Simmons of course was free to point out the lack of *definite* proof that the gun in the photographs was the murder weapon. Ultimately, however, the photographs were relevant to prove identity and opportunity and thus were relevant for permissible purposes under KRE 404(b).

The second *Bell* factor requires a trial court to consider whether the evidence is sufficiently probative of the defendant's commission of the other alleged crimes, wrongs, and acts, *i.e.*, whether "the jury could reasonably

10

conclude that the act[s] occurred and that the defendant was the actor." *Davis v. Commonwealth*, 147 S.W.3d 709, 724-25 (Ky. 2004). The photographs at issue were retrieved from Simmons's cellphone and his mother testified that it was him in the pictures. This evidence was sufficient to support a reasonable conclusion that Simmons appeared in the photographs. Thus the probativeness factor of *Bell* was also satisfied.

Finally, we do not find an abuse of discretion in the trial court's determination that the prejudicial effect of the photographs did not substantially outweigh their probative value. This factor requires the trial court to ask whether "the tendency of the evidence [is] so strongly to lead the jury into improper character inferences that that tendency 'substantially outweigh[s] [the evidence's] probative value' with regard to its proper uses." *Jenkins v. Commonwealth*, 496 S.W.3d 435, 457 (Ky. 2016) (quoting *Bell*, 875 S.W.2d at 890). The cellphone photographs were highly probative of Simmons's identity as the shooter and his opportunity to commit the crimes, given that they showed him with a firearm with a distinctive clear clip similar to the murder weapon. Admittedly, the photographs were also prejudicial, not only because they showed Simmons with a firearm similar to the murder weapon but also with a variety of other firearms as well. Nonetheless, there was nothing particularly shocking about the photographs, which ultimately were little more than mundane photographs of the defendant showing his guns. As such, we agree with the trial court's conclusion that the prejudicial effect of the photographs did not substantially outweigh their probative value.

11

There was no abuse of discretion in the admission of the photographs under KRE 404(b).

### III. The Trial Court Did Not Abuse Its Discretion In Declining Simmons's Request For A Voluntary Intoxication Instruction.

Finally, Simmons argues that the trial court erred in declining to give a voluntary intoxication instruction. Simmons notes that the trial court discussed jury instructions with counsel "informally" and off the record, a practice we have observed with increasing frequency. We advise trial courts that discussions with counsel regarding the crafting of jury instructions should take place on the record. Absent such a record, we are often left to speculate as to the parties' arguments and the trial court's reasoning in reaching a final set of instructions.

Nonetheless, because the Commonwealth acknowledges that Simmons requested a voluntary intoxication instruction and because the trial court made reference to that request in the course of other recorded portions of the trial, we will treat the issue as preserved. *See Brafman v. Commonwealth*, 612 S.W.3d 850, 857 (Ky. 2020). We therefore review the trial court's denial of Simmons's request for a voluntary intoxication instruction for abuse of discretion and harmless error. *Id.*

Voluntary intoxication is a defense to crimes whose elements include the forming of a specific intent, *i.e.*, specific-intent crimes. KRS 501.080(1). However, a voluntary intoxication instruction is warranted only if the proof is sufficient to support a reasonable finding that the voluntary intoxication completely prevented the defendant from forming the requisite intent. *McGuire*

12

*v. Commonwealth,* 885 S.W.2d 931, 934 (Ky. 1994) ("Intoxication, whether voluntary or involuntary, is a defense to an intentional crime if the effect of the intoxication is to *completely negate the element of intent . . . .*") (emphasis added). Mere evidence that the defendant was intoxicated is not sufficient to warrant such an instruction. *King v. Commonwealth,* 513 S.W.3d 919, 923 (Ky. 2017). That is, mere proof of "'impairment of judgment and/or physical control that commonly leads intoxicated persons to do things they would not ordinarily do'" does not, without more, suffice for the giving of a voluntary intoxication instruction. *Hargroves v. Commonwealth,* 615 S.W.3d 1, 8 (Ky. 2021) (quoting *Conyers v. Commonwealth,* 530 S.W.3d 413, 432 (Ky. 2017)). Rather, the proof must be reasonably sufficient "to prove that the defendant was so [intoxicated] that *he did not know what he was doing.*" *Harris v. Commonwealth,* 313 S.W.3d 40, 50 (Ky. 2010) (quoting *Fredline v. Commonwealth,* 241 S.W.3d 793, 797 (Ky. 2007) (emphasis added)).

We have recently spoken to considerations relevant to a trial court's determination of whether to provide a voluntary intoxication instruction:

> A criminal defendant has a basic constitutional right to present a defense, and this entitles the defendant to jury instructions that give effect to a defendant's theory of the case. From this right, a duty is correspondingly imposed on the trial court to instruct on the whole law of the case. Indeed, "a trial court is required to instruct the jury on affirmative defenses and lesser-included offenses if the evidence would permit a juror reasonably to conclude that the defense exists or that the defendant was not guilty."
>
> While instructing the jury in a particular way is a discretionary function of the trial court, a trial court must be especially inclined to give instructions that go to the defendant's state of mind, such as mistake or intoxication. "Intoxication . . . is

13

a defense to an intentional crime if the effect of the intoxication is to completely negate the element of intent; it causes the defendant's mental state to equate with insanity. Voluntary intoxication negate[s] specific intent."

*Brafman*, 612 S.W.3d at 858 (citations omitted). We have also noted that it is well-established a voluntary intoxication instruction "is to be rejected if the evidence does not warrant it." *Harris*, 313 S.W.3d at 50.

The charges at issue here, murder and second-degree assault, are both specific-intent crimes. Murder generally requires a specific intent to cause the death of another person. KRS[3] 507.020. Thus, if the proof is sufficient to support a reasonable finding that a defendant's voluntary intoxication completely prevented him from forming an intent to cause the death of another person, he is entitled to a voluntary intoxication instruction. Similarly, second-degree assault generally requires a specific intent to cause serious physical injury, or to cause physical injury by means of a deadly weapon or dangerous instrument. KRS 508.020(1)(a), (b). Thus, if the proof is sufficient to support a reasonable finding that a defendant's voluntary intoxication completely prevented him from forming an intent to cause serious physical injury or physical injury by means of a deadly weapon or dangerous instrument, he is entitled to a voluntary intoxication instruction.[4]

---

[3] Kentucky Revised Statute.

[4] A wanton state of mind, rather than specific intent, may also suffice to support a conviction for murder or second-degree assault. *See* KRS 507.020(1)(b) & KRS 508.020(1)(c). Voluntary intoxication of course is not a defense to crimes requiring only a wanton or reckless state of mind. *McGuire*, 885 S.W.2d at 934 ("Voluntary intoxication does not negate culpability for a crime requiring a culpable mental state of wantonness or recklessness . . . .").

14

Here, Simmons asserts a voluntary intoxication instruction was warranted because 1) Pierce testified Simmons smoked marijuana before the shootings, 2) two witnesses testified Simmons was tripping on acid that evening, 3) Rednour described Simmons as energetic, intense, and "bouncing off the walls," and 4) one of Helm's friends stated Simmons sounded "messed up" during his FaceTime call with Helm after the shootings. This proof could certainly support a reasonable conclusion that Simmons was under the influence of multiple drugs at the time of the shootings, but it falls short of the necessary showing that he was *so intoxicated he did not know what he was doing.* Absent such proof, there could be no reasonable finding that Simmons's voluntary intoxication rendered him unable to form the intent necessary to commit the crimes of murder and second-degree assault.

Moreover, other proof at trial flatly contradicts any suggestion Simmons was so intoxicated as to be unable to form an intent to kill or injure. For example, immediately after the shootings Simmons had the mental capacity to decide not to go home, to decide upon Rednour's residence in Owensboro as an alternative destination, and to give Pierce physical directions to the St. Anthony trailer park where Rednour lived. *See Soto v. Commonwealth*, 139 S.W.3d 827, 868 (Ky. 2004) (noting defendant's ability to locate a residence was not the action "of a man so intoxicated that he did not know what he was doing"). Additional proof further demonstrating that Simmons had mental control and was aware of his actions include 1) his direction to Pierce to stay in the car when they arrived at the party, 2) his quick return to the car after the

15

shootings, 3) his order to Pierce to "go" when he jumped back in the car, and 4) his confession to Helm shortly after the shootings that he had killed Brown. *See Harris*, 313 S.W.3d at 51 (holding that defendant's memory of and boasting about killing shortly after committing the crime did not "permit a finding that at the time of the offense [he] was so intoxicated that he did not know what he was doing"). Finally, while Rednour described Simmons as energetic and "bouncing off the walls," she also further clarified that Simmons was interacting with Pierce at the time and that his energetic demeanor was typical of interactions between teenage boys.

Thus, while the proof at trial showed that Simmons was intoxicated and excitable, it did not show that his intoxication rose to a level such that he did not know what he was doing or could not form an intent to commit the crimes charged. As such, we perceive no abuse of discretion in the trial court's denial of Simmons's request for a voluntary intoxication instruction. *See Hargroves*, 615 S.W.3d at 9 ("[W]hile [defendant] may have consumed alcohol, the proof does not show he was so drunk he did not know what he was doing. Therefore, we cannot say the trial court abused its discretion by declining to instruct jurors on voluntary intoxication.").

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Daviess Circuit Court.

All sitting. All concur.

16

COUNSEL FOR APPELLANT:

Kayla D. Deatherage
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General